STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ALBERT HERMAN LANDEROS, DEFENDANT-APPEL-LANT.

Argued October 10 and October 17, 1955—Decided November 21, 1955.

*Mr. Morton Stavis* argued the cause for appellant (*Mr. J. Mercer Burrell*, attorney).

*Mr. Chester A. Weidenburner*, Assistant Prosecutor of Union County, argued the cause for the State (*Mr. H. Russell Morss, Jr., Prosecutor*, and *Mr. Hyman Isaac*, Assistant Prosecutor, attorneys).

The opinion of the court was delivered by

WACHENFELD, J. ■ The principal issue in this appeal is whether, on the record before us, it "clearly and convincingly appears" that the verdict of "guilty" returned by the jury was so contrary to the weight of the evidence as to be "the result of mistake, partiality, prejudice or passion." See *R. R.* 1:5–1(*a*).

The indictment charges that on January 30, 1953 in Westfield, Union County, the defendant had carnal knowledge of the complaining witness forcibly and against her will. From the judgment of conviction the defendant appealed directly to this court, we having granted certification in advance in view of the relationship between the instant case and *State v. Landeros*, 20 *N. J.* 69 (decided November 21, 1955).

The complaining witness at the time of the attack was a girl 19 years of age and 21 at the time of trial. The rape itself was established by her uncontradicted testimony, corroborated by a physician who examined her shortly thereafter.

The guilt or innocence in this case, as it so often does in this classification, hinges almost solely on the identification of the defendant as the perpetrator of the crime.

The following is a synopsis of the testimony for the State and the defense.

The complaining witness testified that at approximately 10:15 P. M. on the evening of January 30, 1953 she, unaccompanied, left a soda parlor and was walking on Broad Street, Westfield, in the direction of her home. She observed a colored man approaching, about 5 feet 8 in height, wear-

ing a "bee-bop" hat, a short, close-fitting jacket and light pants. He was wearing old shoes and the collar of his jacket had markings across the front.

As she passed him she became "kind of frightened" and started to go off the sidewalk. He walked past but whirled around, grabbed her, placing his hand over her face, and dragged her about 100 feet into a vacant lot. He demanded money of her and after she gave him what money she had, he then proceeded to commit the rape. The lurid details will be omitted.

She had an opportunity to observe her assailant's face when he was perpetrating the crime and noticed he had a mustache. She observed his hand and noticed he was wearing a double-banded wedding ring. At the trial she unhesitatingly and definitely identified the defendant as the man who had committed the attack.

On cross-examination it developed she had seen the defendant on two occasions after the attack, the first on February 3, 1953—four days later—when she was taken by Westfield police to Belle Mead, where the defendant was employed. There she failed to identify him as her assailant. She was unable to recall the details of that confrontation but acknowledged she had felt his hands and observed he wore a wedding ring.

Concededly, her testimony as to the Belle Mead incident was vacillating and uncertain and undoubtedly affected her credibility in so far as her identification of the defendant was concerned. Thus, she testified that at Belle Mead she had recognized the defendant's voice as that of her attacker and had communicated this fact to the police officers who accompanied her. Subsequently she reversed herself in this respect and said she had not given any indication to the police officers that she could identify the defendant but attempted to say she had communicated this information to a friend, which testimony was, of course, stricken.

She next saw the defendant on March 9, 1953 at the police station in Rahway. He had been taken into custody the day before in connection with an attack upon another woman

and the Rahway police had sent out a teletype saying they had in their custody a man who had been arrested for attempted rape. The complaining witness was taken to the Rahway jail by Westfield police officers, where she immediately recognized and positively identified the defendant as he was led down a hall toward her.

Detective Duelks of the Westfield Police Department, who accompanied the complaining witness to Rahway, testified the identification was made of the defendant while he was standing five feet away from the complaining witness and the defendant did not attempt in any way to deny the accusation but remained silent.

With the exception of the testimony of the physician who attended the complaining witness, this comprises practically all of the evidence produced by the State in its effort to prove the allegations in the indictment.

The defense was an alibi. The defendant testified that on the night in question he was working at Ronnie's Garage in Scotch Plains welding manifolds for racing cars. He was there from approximately 7 P. M. until after 11 P. M. that night. He was regularly employed at Belle Mead and had a second job cleaning offices in a building, but on the night in question he was working in Ronnie's Garage under an arrangement whereby the garage owner permitted him to repair his own automobile in return for which he put in the same number of hours working on automobiles for the owner.

The defendant's alibi was supported by three witnesses, John Rogerson, Louis Yanotta and Michael Fiore. They were all working in Ronnie's Garage on the night in question and testified the defendant was there working on cars during the entire evening and did not leave until 11 P. M. These witnesses had known the defendant for only a period of two weeks prior to the incident itself and each described a reason for his ability to recall the night in question.

Rogerson was entered in a race at Kingsbridge Armory the following evening, January 31, which was a Saturday. He recalled the defendant on Friday night, January 30, helping him get his car ready for the race.

Yanotta testified January 30 was his birthday and he had taken a piece of birthday cake to the garage, giving it to one of his friends. He likewise said the defendant was at the garage until 11 P. M.

Fiore recalled the incident of the birthday cake and corroborated the other witnesses.

A fourth witness, the garage owner, was not present on the night in question. He testified that through his manager arrangements had been made with the defendant whereby he would be permitted to use the garage and that his manager had made a report on the basis of which the witness made an entry in his books as follows: "Landeros, OSL 26-30 repairs to racer body and exhaust, to repay by use of shop for repairs on Chrysler." He said the numerals "26-30" referred to the dates January 26 through January 30. Clark, the manager, who was supposed to have been present on the night of January 30, was not called because he could not be located.

As to the confrontation at Belle Mead, the defendant testified he was called from his work to meet the complaining witness. He was asked whether he spoke any Spanish or Portuguese and if he walked with a limp, both of which he answered in the negative. He was asked to hold out his hands and the complaining witness rubbed them, a fact which she confirmed in her testimony. He was then asked whether he had an Air Force jacket with a fur collar and he replied he did not but that he had a Navy foul weather jacket. He was sent to get the jacket and returned, put it on and walked up and down in front of the complaining witness. He said she shook her head and said, "No," indicating he was not the man.

Concerning the Rahway identification, he testified he was brought into a room where the complaining witness was and one of the detectives pointed to him and said: "That's the man, isn't it?" to which the complaining witness replied, "Yes." He admitted his silence following this identification but explained it by saying he was not asked to participate in

any conversation between the complaining witness and the police officers and nothing was asked of him.

The case was submitted to the jury under a charge to which not only was no objection taken by the defendant but which consisted in major part of requests submitted and in the language employed by him.

The defendant's counsel now urges:

"The defendant in this case was found guilty upon uncorroborated identification testimony, so contradictory, so impossible of belief, that it cannot possibly be a legally competent foundation for convincing a jury beyond a reasonable doubt."

To support this view, the defendant points principally to the testimonial contradictions of the complaining witness respecting the Belle Mead confrontation and her failure to identify the defendant on that occasion; the omission of any reference to a mustache in the description of the assailant entered upon the Westfield police blotter immediately after the attack, whereas the defendant in fact has a very prominent mustache; the misdescription of the defendant as being 5 feet 6 inches in height in the police blotter entry whereas the defendant actually is 5 feet 10 inches; the complaining witness' misdescription of the jacket worn by her assailant, i. e., that it had markings across the front whereas the jacket offered in evidence by the State had no markings in that location; and the complaining witness' testimony that her assailant spoke in a foreign language whereas the defendant does not.

Stressing these as weaknesses and variations in the complaining witness' testimony not evident in the defendant's corroborated alibi, the defendant insists he comes within the purview of *R. R.* 1:5–1(a) entitling him to a new trial.

But the power of an appellate tribunal to reject the findings of a jury is subject to limitations. In the first instance, we may not interfere with the constitutional right of trial by jury by weighing the evidence and substituting our judgment for that of the jury, *Hager v. Weber*, 7 *N. J.* 201, 210 (1951); nor may we set aside a verdict merely

because, in our opinion, we or the jury upon the same evidence might have found otherwise, *Boesch v. Kick,* 97 *N. J. L.* 92, 97 *(Sup. Ct.* 1922); *VanPelt v. Hartough,* 31 *N. J. L.* 331, 335 *(Sup. Ct.* 1865); *Hager v. Weber, supra;* so long as "a verdict * * * rests upon testimony competent to sustain the inference implied in such a finding [it] is ordinarily conclusive" upon us, *Hager v. Weber, supra;* for "our review upon appeal is aimed only at correcting injustice resulting from obvious failure by the jury to perform its function," *State v. Haines,* 18 *N. J.* 550, 565 (1955), and the error of the verdict must appear to us as an "inescapable conclusion," *Hager v. Weber, supra.*

All of these expressions have the same general meaning and are merely crystallized in the present statement of *R. R.* 1:5–1(*a*) that:

"A verdict of a jury shall not be set aside as against the weight of the evidence unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion."

After careful consideration of all of the evidence and every aspect of the defendant's contention, we are satisfied that on the record we should not, within the limitations upon our appellate function as enumerated and outlined above, set aside the verdict against the defendant in the case *sub judice.*

The trial court, at the defendant's insistence, specifically charged that in considering the weight to be given to the alleged identification of the defendant by the complaining witness it "must consider her prior failure to openly identify the same defendant at Belle Mead Depot * * *." It likewise charged:

"The jury must weigh and consider all the evidence, including any contradictions and inconsistencies in the evidence, including the question of identification and the weight of such identification, and if the jury, after considering and weighing all the evidence, is not satisfied beyond a reasonable doubt that the complaining witness has identified the defendant as her attacker accurately and truthfully, he should be acquitted."

Thus, the same contentions made here by the defendant were submitted to the jury in the very language selected by the defendant for the jury's consideration in determining the factual equation.

The complaining witness, in open court, with full knowledge of the consequences of her act, definitely and positively identified the defendant as her assailant. The extent to which her testimony should be believed, taking into account all the factors enumerated which may have a tendency to raise some aura of doubt, was, we believe, properly a question for the jury and we find no justification in the record or under our rule for substituting our judgment for theirs.

Counsel for the defense and the prosecutor of the pleas, evincing firm faith in their respective beliefs, in a rather unusual procedure consented to our going outside of the record in an effort to find further light by examining documentary material which was subsequently offered as having some bearing upon certain disputed questions of fact relating to the issues presented to the jury. This material, although helpful, had no persuasive significance in our ultimate determination.

Finally, it is urged error was committed in the admission of Detective Duelks' testimony that the defendant said, "Nothing," when in his presence and within his hearing he was identified by the complaining witness at the Rahway Police Station, and in the failure of the court to charge the jury as to the weakness of this type of evidence as an admission by the defendant.

Evidence of the defendant's silence when accused of criminal activities, even where at the time the accusation is made he is in the custody of the police, is admissible. *State v. Lamberlino,* 13 *N. J. Misc.* 687 (*Sup. Ct.* 1935); *State v. Claymonst,* 96 *N. J. L.* 1 (*Sup. Ct.* 1921); *State v. Rosa,* 72 *N. J. L.* 462 (*E. & A.* 1905); *State v. D'Adame,* 84 *N. J. L.* 386 (*E. & A.* 1913); *Donnelly v. State,* 26 *N. J. L.* 601, 613 (*E. & A.* 1857); *State v. Sorge,* 125 *N. J. L.* 445 (*E. & A.* 1940).

■ In so far as the court's charge is concerned, the defendant made no request to charge as to the weakness of the "admission" evidence and did not object to the charge as given. There was no obligation, under these circumstances, on the part of the trial court to charge specifically with reference to this testimony inasmuch as it was clearly established that the defendant heard the accusation when it was made.

The judgment of conviction below will be affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices WACHENFELD, JACOBS and BRENNAN—4.

*For reversal*—Justices HEHER, OLIPHANT and BURLING—3.