44 N.J. Super. 250 (1957)
130 A.2d 80
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
FRANK KOBYLARZ, DEFENDANT-APPELLANT, AND RAYMOND BEDNARSKI, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued February 25, 1957.
Decided March 18, 1957.
*252 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. John E. Selser argued the cause for appellant.
Mr. William J. Arnold argued the cause for the State (Mr. Guy W. Calissi, County Prosecutor; Mr. William C. Brudnick, Special Assistant Prosecutor, on the brief).
The opinion of the court was delivered by JAYNE, J.A.D.
On May 31, 1956 the grand jury of the County of Bergen presented to the court an indictment charging the defendant Frank Kobylarz and one Raymond Bednarski with a conspiracy to make and take in the Borough of Wood-Ridge what is commonly known as a book upon the running of horses, mares and geldings, which unlawful *253 project was alleged to have been pursued from June 1, 1955 until on or about August 25, 1955. Not unprecedentedly in such prosecutions the defendant Bednarski retracted his plea of not guilty to the accusations of the indictment, entered a plea of guilty thereto, and testified on behalf of the State in its prosecution of the defendant Kobylarz, who was upon trial by jury convicted of the alleged offense.
Initially we may announce in response to the defendant's first ground of appeal that we have thoughtfully examined the evidence introduced by the State and also that submitted on behalf of the defendant and conclude that there was relevant and competent evidence when the State rested and at the completion of the testimony from which a logical inference of the defendant's guilt of the alleged offense could be deduced by the jury. State v. Picciotti, 12 N.J. 205 (1953); State v. Huff, 14 N.J. 240, 249 (1954); State v. Rogers, 19 N.J. 218, 231, 232 (1955); State v. Kollarik, 22 N.J. 558, 564 (1956), are expressive of the test. Moreover, a conspiracy may be proved by circumstances from which the jury can logically infer its existence. State v. Carbone, 10 N.J. 329, 341 (1952). The motions of the defendant for judgments of acquittal were properly denied.
Another reason assigned for the reversal of the conviction pertains to the cross-examination of the defendant concerning his previous conviction of crime.
On direct examination counsel for the defendant deemed it to be perspicacious in the course of his interrogation unobtrusively to propound the following question to the defendant: "Some years ago you were convicted of a crime, weren't you?" The answer was "Yes, sir."
The following quotation extracted from the transcript exhibits the subsequent cross-examination of the defendant anent the subject:
"Q. What was the crime you were convicted of?
The Court: Just a minute.
Mr. Selser: I object to that question, if your Honor please.
*254 Mr. Galda: May I be heard on the question?
Under direct examination, Mr. Selser asked whether he was convicted of crime years ago.
The Witness: That's correct.
Q. What was the crime?
Mr. Selser: I object to it.
The Court: I will allow it.
The Witness: What was the crime?
Q. Speak loudly and clearly so we can all hear it. A. The crime  I really don't remember offhand, to be honest with you. I don't know much about  I know I pleaded to a crime. I pleaded non vult to a crime.
Q. What was the crime? A. I think it was bookmaking. I am not sure.
Q. Bookmaking. Were you convicted for another crime? A. I was convicted of another one?
Q. Were you, sir? A. Probably if you have it there.
Q. What was that crime? A. That crime, I don't know. That was twenty-five or more years ago, I believe.
Q. In 1951 were you convicted of a crime? A. Yes.
Q. What was that crime? A. That's what I said  it was bookmaking.
Q. Prior to that? A. Then I was convicted of another crime but I said it was about twenty-five years ago.
Q. What was that crime? A. I don't remember it."
The permitted disclosure thus elicited from the defendant that his previous conviction had been for the crime of bookmaking is characterized by his counsel as erroneous and declared to have been materially prejudicial to the defendant. The basis of the insistence is that the disclosure was intended by the prosecution to reveal the propensity of the defendant to commit the crime of bookmaking rather than to affect the credibility of the defendant's testimony. N.J.S. 2A:81-12.
A very illuminating and informational discussion of the distinction between the available use of proof of prior convictions resides in the opinion composed by former Judge Horuvitz in State v. Nagy, 27 N.J. Super. 1 (App. Div. 1953).
In the present case the defendant voluntarily resolved to testify in his own behalf and chose to impart the existence of his prior conviction. He thus subjected himself to cross-examination. Where a defendant either on *255 direct or cross-examination acknowledges a prior conviction of crime, it is not erroneous for the trial court to permit the State by ensuing interrogation to expose such factual components of the judgment of conviction as the production of the record thereof would reveal. State v. Merra, 103 N.J.L. 361 (E. & A. 1927); State v. Rusnak, 108 N.J.L. 84 (E. & A. 1931); State v. Metalski, 116 N.J.L. 543 (E. & A. 1936); State v. Taylor, 5 N.J. 474, 479 (1950); State v. Nagy, supra.
The purpose for which the prior conviction of the defendant was divulged in the present case is indicated by the related passage of the court's instruction to the jury:
"Upon the subject of credibility of any witness or the defendant as such witness, it is now the law that no person offered as a witness shall be excluded by reason of his having been convicted of a crime, but such conviction of crime may be shown for the purpose of affecting his or her credit as such a witness. Pursuant thereto, the state has shown that the defendant has been convicted of crime. You may, therefore, take that into consideration in determining whether or not you will believe the defendant or what weight or credit you shall in your judgment accord to the testimony of that witness."
The remaining feature of the trial which counsel for the defendant criticizes is more engrossing. Here again the episode can be recounted with superior distinctness by the reproduction of the pertinent testimony.
The following extract comes from the testimony of Detective Spahr:
"Q. Now, Detective, subsequently, did you have occasion subsequent to the examination in Palka's Tavern, did you have occasion to speak with the defendant Kobylarz? A. I did.
Q. When and where? A. That afternoon in the Bergen County Prosecutor's Office.
Q. What, if anything, did the defendant Kobylarz say to you at that time? A. He gave me his name and address.
Q. Was he confronted with Mr. Bednarski at that time? A. He was.
Q. And at that time in the presence of Mr. Kobylarz, did Bednarski state this particular operation  the facts concerning the same as testified to here earlier?
Mr. Selser: I object to it.
*256 The Court: I will allow it. A. He did, sir.
Q. Did Mr. Kobylarz either admit or deny at that time 
Mr. Selser: If the Court please, I object.
The Court: Objection sustained.
What did Mr. Kobylarz say?
The Witness: Mr. Kobylarz refused to give any answer whatsoever, sir."
The defendant during his cross-examination imparted the rather equivocal explanation:
"Q. Do you remember when you were brought to the Prosecutor's Office? A. Yes, sir.
Q. When Mr. Bednarski was also in your presence and being interrogated? A. Yes, sir.
Q. And do you recall being asked at that time concerning this alleged operation? A. No, sir.
Q. You don't recall being asked? A. No, sir. They didn't ask me nothing. The only one they asked was Bednarski.
Q. They didn't ask you anything? A. They wanted a statement off me, yes, sir.
Q. Didn't they ask whether or not you entered into an agreement with Bednarski? A. No, sir.
Q. Do you recall Mr. Spahr  will you stand up?
(Detective Spahr stands in the audience.)
Q. Did this gentleman, known as Detective Spahr, ask you questions concerning this? A. Someone did, sir, but I don't remember who they were  there were so many in there.
Q. They did ask you questions, didn't they? A. All they asked me was my name and address and that was all I said.
Q. Is that all they asked you? A. I don't remember what they asked me, sir.
Q. They asked you other questions though, didn't they? A. They probably did but I don't remember them.
Q. During that time, did you state to Detective Spahr that you refused to answer any questions? A. That is what they always tell you 
Q. Did you know what they always do, did you at that time?
A. Did I state to them I refuse to answer any questions?
Q. That's right. A. I don't know. I don't remember. I probably did. I am not sure."
Whenever during the past century the members of the bench and bar have been concerned in this jurisdiction with the rule of evidence appertaining to tacit admissions in criminal cases, sometimes characterized as the doctrine of *257 assenting silence, they have habitually consulted the decision in Donnelly v. State, 26 N.J.L. 601 (E. & A. 1857), wherein the rule is announced:
"When a matter is stated in the hearing of one, which injuriously affects his rights, and he understands it, and assents to it, wholly or in part, by a reply, both are admissible in evidence; the answer, because it is the act of the party, who is presumed to have acted under the force of truth, and the statement as giving point and meaning to the action. So, also, silence, unless it be accounted for by some of the circumstances which have been specified, or by other sufficient reasons, may be taken as a tacit admission of the fact stated; because a person knowing the truth or falsity of a statement affecting his rights, made by another in his presence, under circumstances calling for a reply, will naturally deny it, if he be at liberty so to do, if he does not intend to admit it." Some of the many successive illustrations of its application appear in Parker v. State, 61 N.J.L. 308, 313 (Sup. Ct. 1898), affirmed 62 N.J.L. 801 (E. & A. 1899); State v. Rosa, 72 N.J.L. 462 (E. & A. 1905); State v. Johnson, 73 N.J.L. 199, 202 (Sup. Ct. 1906); State v. MacFarland, 83 N.J.L. 474 (E. & A. 1912); State v. Kysilka, 84 N.J.L. 6 (Sup. Ct. 1913), affirmed 85 N.J.L. 712 (E. & A. 1914); State v. D'Adame, 84 N.J.L. 386 (E. & A. 1913); State v. Morris, 94 N.J.L. 19 (Sup. Ct. 1919), affirmed 94 N.J.L. 567 (E. & A. 1920); State v. Claymonst, 96 N.J.L. 1 (Sup. Ct. 1921); State v. De Paola, 5 N.J. 1, 15 (1950); State v. Picciotti, 12 N.J. 205, 209 (1953); State v. Landeros, 20 N.J. 76, 84 (1955); State v. Kane, 9 N.J. Super. 254 (App. Div. 1950); State v. Bulach, 10 N.J. Super. 107, 114 (App. Div. 1950); State v. Bobbins, 35 N.J. Super. 494, 502 (App. Div. 1955), affirmed 21 N.J. 338 (1956). See, additionally, 80 A.L.R. 1235; 115 A.L.R. 1510.
Basically, the rationale of this rule of evidence is probably inherent in the proverbial expression that "silence gives consent." There are many familiar proverbs and maxims of an oppugnant meaning: "Closed lips hurt no one, speaking may"  Cato; "Silence, like a poultice, comes to heal the blows of sound"  Holmes; "Silence never betrays you" *258  O'Reilly; "Silence is the most perfect expression of scorn"  Shaw; "It is the wise head that makes the still tongue"  Lucas; "Silence never shows itself to so great an advantage as when it is made in reply to calumny and defamation"  Addison.
It is said nevertheless that the crystallization of human experience has disclosed it to be the natural reaction of one accused of crime spontaneously to deny the accusation if it is unfounded. This was declared to be an unreliable basis for a rule of evidence by Chief Justice Maxey in his noted dissenting opinion in Commonwealth v. Vallone, 347 Pa. 419, 32 A.2d 889 (Sup. Ct. 1943). It is a very interesting composition and should be read.
Some psychologists regard silence per se to be a neutral factor and aside from a consideration of the surrounding circumstances as indicating neither guilt nor innocence, and thus the determination whether the statement is patently incriminatory and was made in the hearing of the accused at such a time and place and in such a manner and environment as naturally to invite a response, becomes an essential determinative of the probative value, if any, of the inference to be drawn from his silence. Vide, for examples, Commonwealth v. Coyne, 115 Pa. Super. 23, 175 A. 291 (Super. Ct. 1934); Riley v. State, 107 Miss. 600, 65 So. 882, L.R.A. 1915A, 1041 (Sup. Ct. 1914).
There are at least two divergently expressed conceptions of the purpose of such evidence: the one, to prove a tacit admission by the accused of the truth of the incriminatory statement; the other, to show a deviation from type, an abnormality in the silence of the accused which displays his consciousness of guilt.
Professor Wigmore has expressed favor toward the admission in evidence of corresponding statements and facts tending to disclose a consciousness of innocence. Wigmore, Evidence (3d ed.), § 293. But see Underhill's Criminal Evidence (5th ed.), § 382.
It must be acknowledged that the versatile conventionalities of human emotions and impulses constitute an erratic *259 and unstable pedestal upon which to perpetuate a rule of law. We observe today that so many accused persons deliberately recognize safety in silence and are more interested in protection from eventual prosecution and conviction than in preliminary protestations of innocence.
That this rule of evidence has been rejected by many courts of the highest credit is evident upon a review of the authorities. It is the view of this court that where an accused is in the custody of the police at a relatively formal meeting deliberately arranged and attended by officers hostile to him and there faced with the incriminatory accusations, the circumstances amid which he remains silent should be shown to be such that no explanation of his silence is reasonable other than his acquiescence in the truth of the accusations. Even so, the court without specific request should inform the jury of the several elements of the rule governing the admissibility and weight of such evidence. Indeed, some courts have evaluated evidence of silence in such situations as not sufficient to support a conviction in the absence of other evidence from which guilt may be logically inferred. Commonwealth v. Karmendi, 325 Pa. 63, 188 A. 752 (Sup. Ct. 1937); 53 Dickinson Law Rev. 518.
To constitute proof of an admission by silence, it must be disclosed by evidence (1) that the statement was extra-judicial; (2) that it was incriminatory or accusative in import; (3) that it was one to which an innocent man would in the situation and surrounding circumstances naturally respond; (4) that it was uttered in the presence and the hearing of the accused; (5) that he was capable of understanding the incriminatory meaning of the statement; and (6) that he was at liberty to deny or reply thereto. 2 Wharton's Criminal Evidence, § 409. Prosecuting attorneys should therefore behold the elements of proof necessary to erect the basic premise for the application of the rule. Without the precursory proof of those indispensable elements of fact, the reception in evidence of the statement and of the evidence of the silence of the accused is futile and erroneous.
*260 "Where admissions are implied from silence, the trier of the facts should be doubly cautious, for in addition to the reasons that apply to oral confessions, there may be doubt whether the defendant heard and understood the statement which his silence is supposed to admit as true, and doubt whether he did not consider that he ought to remain silent until he were directly questioned." State v. Toohey, 6 N.J. Super. 97, 101 (App. Div. 1950).
Of the requisite factual elements of preliminary proof none is of more significant importance than a reasonably literal recitation of the language, phraseology, diction and mode of expression of the accusative statement. Only from such information can the imputative character and accusatory import of the declaration be determined.
Noticeably in the present case, the representative of the State did not endeavor to elicit from the witness Detective Spahr a reasonably specific and definite representation and reproduction of the actual utterances of the co-conspirator Bednarski in the hearing of the defendant on the designated occasion.
Probably to accelerate the progress of the trial, the manifestly leading question was addressed to the witness which squeezed out of him the affirmative answer that in the judgment of the witness, Bednarski did state in the presence of the defendant "this particular operation  the facts concerning the same as testified to here earlier." While possible, it seems inconceivable that except in comparative substance the declarations of Bednarski at the prosecutor's office were as capacious as his testimony at the trial. However, for reasons too obvious to need exposition, we express our disapproval of that method of endeavoring to prove the previous extra-judicial statement.
But, should we upon our deliberate consideration of the entire record ascribe to that irregularity such a harmful and prejudicial consequence in the trial of the defendant as to require in the interests of fundamental fairness a reversal of the judgment of conviction?
It is noticeable that in the present case the trial judge discussed the so-called assenting silence rule in his instructions to the jury. We quote:
*261 "* * * If a defendant remains silent in the face of an oral accusation of guilt or declaration injuriously affecting his position of guilt or innocence under circumstances calling for a denial on his part, it may be taken against him. Silence, unless it is accounted for by some sufficient reason, may be taken as a tacit admission of the fact stated  all the circumstances of the crime and occasion should be considered by the jury when estimating the value of the implied admission and in determining whether any is to be inferred. Whether the circumstances call for a reply and what significance to be attached to whatever occurred, is for the jury alone to determine. The fact the defendant was in the custody of the police at the time he remained silent does not preclude proof of the facts but his custody is a circumstance to be taken into consideration.
Silence alone is a very slight evidence of guilt and aside from the interference which may arise from the attendant circumstances, shall be received with caution as proof of guilt, and if from the attendant circumstances he shall show to the satisfaction of the jury that his silence was caused by reasons or prompted by motives consistent with his innocence, the accusatory statements and his silence should be disregarded and among the many reasons which he may show for silence would be that a few minutes before he had denied a similar accusation."
Compare, State v. Landeros, supra, 20 N.J., at page 85.
Thus the jurors were informed that "silence alone is a very slight evidence of guilt" and "shall be received with caution as proof of guilt," and that "whether the circumstances call for a reply and what significance to be attached to whatever occurred is for the jury alone to determine." The explanations given by the defendant at the trial concerning what had been said in his presence and hearing at the prosecutor's office were conspicuously evasive.
While in general there exists a recognizable conflict of judicial opinion on the subject, it is settled in our jurisdiction that evidence of the defendant's silence is not necessarily to be excluded merely because at the time that he was confronted with the accusative statement, he was, as perhaps in this instance, in the custody of police officers. State v. Landeros, supra. See, contra, People v. Pignataro, 263 N.Y. 229, 188 N.E. 720 (Ct. App. 1934); 20 Wash. L. Rev. 234.
We have concluded to affirm the judgment.